Thomas SACCO, et al., Plaintiffs,

v.

George E. PATAKI, et. al., Defendants.

Judith ABRAMSON, et al., Plaintiffs.

v.

George E. PATAKI, et al., Defendants.

Nos. 95 Civ. 8627(MGC), 96 Civ. 9291(MGC).

United States District Court, S.D. New York.

Oct. 10, 1997.

Charles L. Weintraub, New York City, Snow Becker Krauss P.C., New York City by Leonard W. Wagman, for Sacco plaintiffs.

Law Office of Ronald L. Kuby, New York City by Ronald L. Kuby and Daniel Perez, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City by Hillary Richard, Caroline Rule and Andrew Fields, for Abramson plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York, New York City by Daniel F. De Vita, Assistant Attorney General, for defendant George E. Pataki.

Elizabeth Bradford, General Counsel of New York Convention Center Operating Corp., New York City, Jackson, Lewis, Schnitzler & Krupman, White Plains, NY by Andrew A. Peterson, for defendants New York Convention Center Operating Corp., Robert E. Boyle, and William L. Mack.

Roberts & Finger, LLP, New York City by Joel L. Finger, and Jordan D. Schiffman, Testa, Hurwitz and Theibeault, Boston, MA by John F. Welsh and Maria H. Bowen, for defendant New York Trade Show Contractors' Association.

Cohen, Weiss and Simon, New York City by Richard M. Seltzer, Michael L. Winston and Joseph J. Vitale, for defendants International Brotherhood of Teamsters, Ronald Carey, Local 807, and Johnnie Brown.

## OPINION

CEDARBAUM, District Judge.

These two related actions are brought by union members who worked for many years at the Jacob Javits Center but could not obtain employment there after a highly publicized effort to eradicate corruption and ties to organized crime from the Javits Center. Plaintiffs in *Thomas Sacco, et al. v. George E. Pataki, et al.*, 95 Civ. 8627(MGC).("*Sacco* Plaintiffs" and "*Sacco* Action"), are sixty-two members of the Truck Drivers Local Union 807 ("Local 807") of the International Brotherhood of Teamsters ("IBT") who worked at the Javits Center until June of 1995. They sue Local 807, IBT, George A. Pataki, the Governor of New York, the New York Con-vention Center Operating Corporation ("Operating Corporation"), a public benefit corporation operating the Javits Center, Robert E. Boyle, President and CEO of the Operating Corporation and Special Assistant to the Governor, William L. Mack, Chairman of the Board of Directors of the Operating Corporation, Ronald Carey, President of IBT, Johnnie Brown, the Trustee of Local 807, and the New York Trade Show Contractors' Association ("TSA"). The *Sacco* Plaintiffs assert claims under 42 U.S.C. § 1983 and § 1985 for violations of the United States Constitution and the Labor Management Relations Act, as well as state law claims. The *Sacco* Plaintiffs were permitted to file an amended complaint (hereafter simply the "Sacco Complaint") because the initial complaint made vague and conclusory allegations. The *Sacco* Complaint, therefore, represents the best factual allegations that they can make in this case.

Plaintiffs in *Judith Abramson, et al. v. George E. Pataki, et al.*, 96 Civ. 9291(MGC) ("*Abramson* Plaintiffs," "*Abramson* Action," and "*Abramson* Complaint"), are members of Local 829 of the Exposition Worker's Union who worked at the Javits Center moving exhibits, displays, and merchandise, as well as building and setting up exhibits prior to June of 1995. They sue Pataki, the Operating Corporation, and Boyle under 42 U.S.C. § 1983.[1]

The defendants move to dismiss both complaints pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons that follow, the motions are granted in part and denied in part.

### Allegations of the Complaints

The Javits Center, which is used for the presentation of various trade show exhibitions, was created by New York Public Authorities Law §§ 2560–2572 as a public benefit corporation. From the Javits Center's opening on April 3, 1986 until June 30, 1995, workers from various unions were employed to move exhibits, displays, and merchandise into the Javits Center and to set up and dismantle exhibits. The shows at the Javits

---

1. The Abramson Plaintiffs initially sued Mack as well, but at oral argument on June 26, 1997, they withdrew their claims against Mack. They also withdrew their § 1985 claim at oral argument.

Center were organized and labor was provided by various trade show contracting companies. The TSA is the largest association of trade show contractors that provided workers to the Javits Center. (Sacco Compl. ¶ 33; Abramson Compl. ¶ 16.) Until June of 1995, workers were selected by the trade show company which organized the particular show in accordance with the procedures established in written collective bargaining agreements between the individual unions and the TSA. (Sacco Compl. ¶ 33; Abramson Compl. ¶ 24.)

On November 7, 1985, prior to the Javits Center's opening, the Operating Corporation entered into a Memorandum of Understanding ("MOU") with a number of unions including Local 807 and Local 829. The MOU provided that collective bargaining agreements must contain "no-strike" provisions and that disputes concerning the MOU and jurisdiction of the unions would be resolved by "an Impartial Chairman." (Sacco Compl. Ex. B; Abramson Compl. Ex. A.) The MOU also provided that freight handling at the Javits Center would be performed by workers represented by the unions that had jurisdiction over work at the New York Coliseum, which included Local 807 and Local 829. (*Id.*)

Both Local 807 and Local 829 had collective bargaining agreements with the trade show contractors. The Operating Corporation was not a party to any of the collective bargaining agreements, and the agreements contemplated providing work to other locations in addition to the Javits Center. In October of 1994, the TSA and Local 807 entered into a collective bargaining agreement covering the period from October 1, 1994 to September 30, 1998. (*Id.*) Local 807's collective bargaining agreement included a seniority provision under which a seniority list of forty-seven people was to be maintained and those on this list were to have preference for the highest paying jobs. (*Id.*) The agreement also prohibited sub-contracting, (*id.*), and conflicting agreements with individual employees, (*id.*). Section 23(A) of the agreement provided that it was binding on all the successors of the parties. Thirty-four of the workers on the seniority list are

plaintiffs in the Sacco Action, and the remaining Sacco Plaintiffs would have been eligible to be on the list. (Sacco Compl. ¶¶ 37–38).

Local 829, the Abramson Plaintiffs' union, entered into identical collective bargaining agreements with various trade show contractors. (Abramson Compl. ¶ 37). Their collective bargaining agreements provided that Local 829 was to be the exclusive representative of employees who installed exhibits and booths at trade shows and expositions. (*Id.* ¶ 39). The most recent of such agreements covered the period from September 1, 1993 to August 31, 1996. (*Id.* ¶ 38).

Until June 30, 1995, the TSA provided much of the labor for the various trade shows held in the Javits Center, and the workers were hired under the provisions of the various collective bargaining agreements between the unions and the trade show contractors. In early 1995, there was growing publicity concerning corruption at the Javits Center and alleged ties of the workers to organized crime. In response, Pataki, Boyle, and Carey made several public statements about eradicating inefficiency and mob corruption at the Javits Center. (Sacco Compl. ¶¶ 52–54; Abramson Compl. ¶¶ 51–54.) Pataki allegedly stated that he would "take back control" of the Javits Center and rid it of its mob taint. (*Id.*)

On or about June 30, 1995, Pataki, Boyle, and the Operating Corporation abrogated the collective bargaining agreements between the TSA and the various unions and took direct control of hiring at the Javits Center. They informed the TSA and the workers then employed at the trade shows, including the Sacco and Abramson Plaintiffs, that the collective bargaining agreements were no longer valid and that workers needed to apply directly to the operating Corporation for employment at the Javits Center. (Sacco Compl. ¶ 55; Abramson Compl. ¶ 47.)

In a letter dated June 28, 1995 addressed generally to "Labor Leaders," Boyle wrote as the President and CEO of the Operating Corporation that "[a]lthough we do not believe that the Javits Center is legally bound by the November 7, 1985 Memorandum, this letter will as a matter of courtesy to the

union signatories, serve as notice that we formally disavow and terminate that document." (Sacco Compl. Ex. C; Abramson Compl. Ex. B). The letter was signed only by Boyle, but made references to the "Governor's firm commitment to do whatever is necessary" and stated that the "Governor, the Board of Directors, and [Boyle]" were grateful to the honest and productive union members. (*Id.*)

Both the Sacco and Abramson Plaintiffs allege that on June 29, 1995, the Operating Corporation, through Boyle, Mack, and Brown, entered into secret agreements with Local 807 and Local 829 respectively. According to the Sacco Complaint, the secret agreement with Local 807 provided that a prearranged collective bargaining agreement was to be executed immediately after Local 807 obtained recognition as one of the bargaining representatives of the Javits Center's workers. (Sacco Compl. ¶ 58). Pursuant to this secret agreement, a new collective bargaining agreement was entered into between the Operating Corporation and Local 807, the terms of which were never presented to the rank and file members of Local 807. (*Id.* ¶ 59).

The Abramson Plaintiffs allege upon information and belief that in negotiating the June 29 secret agreement, Local 829 officials sought and received assurances from the Operating Corporation that Local 829 members would be rehired. (Abramson Compl. ¶ 67). Furthermore, during the negotiations, the Javits Center officials allegedly confirmed that members of the public would be hired only if jobs remained after all the available and eligible union members were hired. (*Id.* ¶ 73). The content of the negotiations and the provisions of the June 29 agreement between the Operating Corporation and Local 829 were not divulged to the rank and file members of Local 829. (*Id.* ¶ 80).

On June 30, 1995, both the Sacco and Abramson Plaintiffs filled out applications for employment at the Javits Center. Each of the Sacco Plaintiffs wrote on the back of the application that he reserved his rights under the Agreement. (Sacco Compl. ¶ 106). Members of the general public were permitted to apply for jobs on June 30, 1995 despite

the assurances allegedly provided to Local 829. (Abramson Compl. ¶ 85). The Javits Center hired very few members of Local 829 and Local 807 despite their substantial experience working at the Javits Center and in the trade show industry. (Sacco Compl. 61; Abramson Compl. ¶ 96).

Only seven of the sixty-two Sacco Plaintiffs have been offered employment by the Javits Center, and none of the Sacco Plaintiffs on the forty-seven person seniority list has been offered employment since June 30, 1995. Those who have been offered work have allegedly lost their seniority status, been offered pay below the hourly rate agreed upon in the old collective bargaining agreement, and have been hired on a probationary basis subject to possible fingerprinting, photographing, and provision of references and information concerning members of the immediate family. (Sacco Compl. ¶¶ 64–65). By July 7, 1995, only fifteen to twenty of the approximately 200 members of Local 829 who had applied had been offered employment at the Javits Center. (Abramson Compl. ¶¶ 84, 97). Fewer than ten Local 829 members are presently employed at the Javits Center. (*Id.* ¶ 98.) Both the Sacco and Abramson Plaintiffs allege that they generally have not been able to find similar employment and some have had difficulty finding any employment since June of 1995. (Sacco Compl. ¶¶ 120–21, 155; Abramson Compl. ¶¶ 109–10.) New York State troopers prevented the entrance to the Javits Center of the Abramson and Sacco Plaintiffs who were not offered employment. (Sacco Compl. ¶ 61; Abramson Compl. ¶ 94).

## Discussion

On a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of the plaintiff, *Bolt Electric, Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## I.  § 1983

Both the Sacco and Abramson Plaintiffs assert several claims under 42 U.S.C. § 1983. Section 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

To assert a claim under § 1983, plaintiffs must allege the deprivation of a federal right under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980). Defendants argue that plaintiffs fail to allege the deprivation of any federally protected right.

For the reasons that follow, all the § 1983 claims are dismissed except the claim that plaintiffs were deprived of liberty without due process of law.

## A.  Liberty

■■■ Plaintiffs contend that they were deprived of liberty without due process of law in violation of the Fourteenth Amendment. The Fourteenth Amendment protects against state action which removes or significantly alters constitutionally protected property or liberty interests without a hearing which comports with due process requirements. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2704–05, 33 L.Ed.2d 548 (1972). Plaintiffs argue that the public statements made about mob corruption immediately prior to their loss of employment at the Javits Center impugned their reputations and damaged their standing in the community. Plaintiffs allege that they have had difficulty obtaining other employment because of the stigma of the statements. (Sacco Compl. ¶¶ 120–21, 155; Abramson Compl. ¶¶ 109–10.)

In certain circumstances, defamation by a public official can cause deprivation of liberty. *See Roth,* 408 U.S at 573, 92 S.Ct. at 2707. Defamatory statements by themselves, however, cannot deprive an individual of a constitutionally protected liberty interest. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976). There must be some tangible injury in addition to the defamation, a "stigma plus" requirement. *Id.* at 700–01, 96 S.Ct. at 1160–61; *Valmonte v. Bane,* 18 F.3d 992, 999–1000 (2d Cir.1994); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). To satisfy this "stigma plus" requirement, a defamation must be coupled with "dismissal from a government job or deprivation of some other legal right or status." *Neu,* 869 F.2d at 667.

Defendants argue that plaintiffs fail to allege even defamation. They argue that because hiring decisions are based on a number of factors such as skill, experience, and attitude, the Javits Center's decision not to hire any particular individual cannot be viewed as a statement that such individual is corrupt or tied to organized crime. Although defendants are correct in the abstract, their argument is less persuasive when all inferences are drawn in favor of plaintiffs. Plaintiffs worked at the Javits Center for many years before the Operating Corporation decided to take direct control of hiring, Pataki and officials of the Operating Corporation publicly stated that the reason for taking direct control of hiring was to end "the stranglehold of organized crime" at the Javits Center. (Sacco Compl. ¶ 52(e); Abramson Compl. ¶ 56.) In addition, after taking direct control of hiring and refusing to hire plaintiffs, Pataki claimed victory over the evils that had plagued the Javits Center. (Sacco Compl. ¶ 52(e); Abramson Compl. ¶ 57.) Considering that plaintiffs were experienced and skilled workers who were apparently satisfactory workers until Pataki and the Operating Corporation decided to eliminate corrupt and mob-tied employees from the Javits Center, plaintiffs may be able to establish that the refusal to hire them was in effect a public declaration that they were corrupt and had ties to the mob. Although it is an extremely close question, when all reasonable inferences are drawn in favor of plaintiffs, plain-

tiffs' claim cannot be dismissed on the face of the complaint for failing to allege defamation.

Defendants argue that even if plaintiffs sufficiently allege damage to reputation, they do not satisfy the "stigma plus" requirement. Dismissal from government employment incident to defamation satisfies the "stigma plus" requirement. *Neu,* 869 F.2d at 667. In certain circumstances, the government's refusal to rehire an employee can also satisfy the "stigma plus" requirement if "in declining to re-employ [an employee, the state] impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2702. Even without termination from government employment or a refusal to rehire, in certain very limited circumstances, defamation can implicate liberty interests if it effectively deprives an individual of the opportunity to obtain employment in his chosen field of employment. *Valmonte,* 18 F.3d at 1001–1004 (recognized deprivation of liberty interest when defamation did not occur in conjunction with termination of government employment or failure to rehire but when a statute required prospective employers to justify the hiring of plaintiff).

Plaintiffs were not technically terminated from government employment or refused re-employment by the government since they were employed by the TSA and not directly by the Operating Corporation. Plaintiffs allege, however, that the Operating Corporation "exercised control of hiring and work rules at the Javits Center," (Abramson Compl. ¶ 36), and was in effect a co-employer even prior to June of 1995, (Sacco Compl. ¶ 47; Abramson Compl. ¶¶ 36, 44). Plaintiffs also allege that in 1991, Governor Mario Cuomo appointed an Inspector General, Henry Flinter, to oversee the operation of the Javits Center. The Inspector General screened union members hired at the Javits Center and took over the function of distributing paychecks and generally exercised direct control over the workers. (Sacco Compl. ¶¶ 48–51; Abramson Compl. ¶¶ 41–44.)

Although plaintiffs' legal status appears to fall short of official government employment, drawing all inferences in favor of plaintiffs,

the complaints allege a close and extended relationship with the Javits Center that approaches direct employment. Accordingly, plaintiffs may be able to show that they were in effect terminated or refused re-employment by the government in satisfaction of the "stigma plus" requirement. Furthermore, the complaints allege that plaintiffs have had difficulty obtaining alternative employment in the trade show industry following the takeover of the Javits Center. (Sacco Compl. ¶¶ 120–21; Abramson Compl. ¶¶ 137–39.) Plaintiffs argue that because New York State is the largest employer and dominant force in the trade show industry and because of the public and stigmatizing manner in which they were not hired, they are now effectively precluded from their chosen field of employment. (Sacco Pl.'s Memo in Opp'n at 42.)

It is an extremely close question whether plaintiffs sufficiently allege "stigma plus." However, liberty protected by the Fourteenth Amendment of the Constitution encompasses more than freedom from bodily restraint and includes the right "to engage in any of the common occupations of life." *Roth,* 408 U.S. at 572, 92 S.Ct. at 2707. "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Id.* Because liberty is a broad and "necessarily amorphous concept," *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 441 (2d Cir.1980), "it is essential that a litigant be afforded a reasonable opportunity to prove facts which, taken together, state a claim", *id.* at 442. Accordingly, drawing all reasonable inferences in favor of plaintiffs, plaintiffs' claims of deprivation of liberty without due process survive defendants' motions to dismiss.

**B. Property Interest**

Plaintiffs also allege deprivation of a property interest in continued employment at the Javits Center without due process of law. (Abramson Compl. ¶¶ 123–27, 140–43; Sacco Compl. ¶¶ 80–84.) To have a constitutionally protected property interest in a benefit such as a job, a person must have a "legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. An abstract need or

desire or a unilateral expectation is not sufficient. *Id.* Property interests are not created by the Constitution, but rather by independent sources such as state law. *Id.* at 577–78, 92 S.Ct. at 2709–10. A written contract can evidence the existence of a legitimate claim of entitlement, but the absence of such a written instrument does not preclude it. *See Perry, v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699–2700 (1972).

■ Plaintiffs argue that a legitimate claim of entitlement to employment at the Javits Center was created by a combination of the collective bargaining agreements, the MOU, and well-established custom, policy, and practice. The collective bargaining agreements and the MOU do not provide plaintiffs with a contractual right to continued employment at the Javits Center. In fact, the Operating Corporation was not a party to the collective bargaining agreements, and the agreements concern employment at several locations, not just at the Javits Center. They do not guarantee work at the Javits Center or any of the other locations. The MOU does not guarantee employment at the Javits Center either, but just outlines certain understandings between the Operating Corporation and the unions about the conditions of employment. Thus, the collective bargaining agreements and the MOU do not create a legitimate claim of entitlement to continued employment at the Javits Center.

■ Plaintiffs argue that even if the MOU and the collective bargaining agreement did not create a property interest, the custom and practices of the trade show industry and the Operating Corporation did. For nearly ten years from the Javits Center's opening until June of 1995, the TSA provided the labor unions with a schedule of shows to be held at the Javits Center each year and the number of employees the shows would require. (Sacco Compl ¶ 34; Abramson Compl. ¶ 20.) Through this policy, a majority of the Abramson Plaintiffs spent 75 to 100 percent of their working hours at the Javits Center. (Abramson Compl. ¶ 104.) The Sacco Plaintiffs also spent many years working at the Javits Center and had obtained a place on the seniority list for work there. (Sacco Compl. ¶ 37, 62.)

Even in the absence of a formal contractual right, policy and custom can create a legitimate claim of entitlement to certain benefits. *See Perry,* 408 U.S. 593 (teacher was entitled to an opportunity to prove that the "policies and practices" of the college had created a protected property interest in tenure position absent contract); *Ezekwo v. NYC Health & Hospitals Corp.,* 940 F.2d 775 (2d Cir.1991) (resident in hospital had a property interest in the Chief Resident position even though no agreement between the hospital and the resident expressly provided for it). However, the fact that plaintiffs had been given the opportunity to work at the Javits Center for several years cannot constitute the policy or custom necessary to create a legitimate claim of entitlement to continued employment. If that were the case, all government employees who had worked for a number of years would have a constitutionally protected interest in continued employment; no long-term government employee could be terminated without a hearing that comported with due process requirements. Something more is required to create a constitutionally protected property interest. There must be mutually explicit "rules and understandings, promulgated and fostered by state officials" that create a legitimate claim of entitlement to continued employment. *Perry,* 408 U.S. at 602.

Even if plaintiffs could be considered government employees prior to June of 1995, no agreement, memorandum, policy, or custom created a legitimate claim of entitlement to continued employment at the Javits Center. Accordingly, defendants' motions to dismiss plaintiffs' § 1983 claims of deprivation of property without due process are granted.

## C. First Amendment

Both the Sacco and Abramson Plaintiffs allege that they were not hired to work at the Javits Center because they exercised their First Amendment rights. The Sacco Plaintiffs allege violations of their First Amendment right of free speech as well as free association. (Sacco Compl. ¶ 93–112.) The Abramson Plaintiffs allege only violation of their First Amendment right to freely

associate with their labor union, Local 829. (Abramson Compl. ¶¶ 128–32.)

As an initial matter, Pataki argues that plaintiffs were never government employees and that declining to hire an applicant because of prior statements and associations does not violate the First Amendment. (Pataki's Sacco Memo. at 23 n. 13.) Pataki is correct that most First Amendment § 1983 claims involve public employees who were fired for statements made during their employment, and not applicants who were refused employment because of prior statements. But even if plaintiffs are treated as government employees, they fail to allege violations of the First Amendment.

### 1. Sacco Plaintiffs' Free Speech Claim

■ The Sacco Plaintiffs contend that they were not rehired to work at the Javits Center because of their public opposition to the trusteeship imposed on their local union by its parent, IBT, and because of their opposition to the abrogation of their collective bargaining agreement. (Sacco Compl. ¶¶ 94–112.) A state cannot condition public employment in a way that infringes upon an employee's right to free expression. *Keyishian v. Board of Regents*, 385 U.S. 589, 605–606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967). However, a government employer does not violate the First Amendment every time it takes adverse action based on an employee's speech. The First Amendment only protects a government employee's right to speak on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 145–46, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). If the speech in question does not address a matter of public concern, there is no First Amendment violation. If, however, the speech is on a matter of public concern, the court must balance the interest of the employee "as a citizen, in commenting upon matters of public concern" and the interest of the government employer "in promoting the efficiency of the public services". *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968).

A matter is of public concern under the First Amendment if it can be fairly characterized as relating to a matter of political, social, or other concern to the community. *Connick*, 461 U.S. at 145–46, 103 S.Ct. at 1689–90. Speech is more likely to be of public concern if the speaker is speaking as a citizen on matters of public interest, and not solely as an employee on matters only of personal interest. *Id.* at 147, 103 S.Ct. at 1690; *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 585 (7th Cir.1992). When a public employee speaks on matters only of personal interest, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id.* at 149, 103 S.Ct. at 1691. The main concern is that citizens not be deprived of their fundamental right to comment on public matters by virtue of working for the government. The determination of whether speech is of public concern must be made as a matter of law based on the content, form, and context of the allegedly protected remarks. *Id.* at 147–48, 103 S.Ct. at 1690–91.

In light of its content, form, and context, neither the Sacco Plaintiffs' opposition to the trusteeship nor their reservation of rights under the old collective bargaining agreement are matters of public concern. The opposition to the trusteeship was essentially an internal dispute concerning the decisions of the union's leadership. The Sacco Plaintiffs voiced their opposition to the trusteeship as employees and union members. They were speaking as employees and union members, not as citizens. The reservation of rights under the collective bargaining agreement was also a personal, self-interested statement and not a statement made as a citizen on a matter of public concern. *See, id.* at 148–49, 103 S.Ct. at 1690–91 (questionnaire distributed by assistant district attorney regarding confidence and trust in supervisors office morale, and need for grievance committee were not matters of public concern).

The fact that the Sacco Plaintiffs' opposition was reported to and covered by the press, (Sacco Compl. ¶¶ 95–100), does not transform what is essentially an intra-union dispute into a matter of public concern. *See Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412–13 (6th Cir.1994) (press release issued by public hospital employee challenging use of public funds and alleging work rules may endanger patients not matters of public concern). Furthermore, the private nature of the statements is not affected by the fact that they arose in the context of a public effort to clean up the Javits Center. Matters raised by disgruntled employees regarding internal management policies are not generally matters of public concern under the First Amendment even if they raise issues that are of general interest. *See Colburn*, 973 F.2d at 586 ("[T]he fact that the issue could be 'interesting' to the community does not make it an issue of public concern"); *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir.1988) ("[W]hat is of general interest to the public is not necessarily of public concern for First Amendment purposes.")

The Sacco Plaintiffs' statements concerned intra-union matters and the conditions of their employment. Plaintiffs spoke primarily as employees, not as citizens. Accordingly, the Sacco Plaintiffs' First Amendment free speech claim is dismissed.

### 2. Free Association

Both the Sacco and Abramson Plaintiffs allege that they were not hired to work at the Javits Center in violation of their constitutional right of free association. (Sacco Compl. ¶ 105; Abramson Compl. ¶¶ 128–132.) In *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244; 82 L.Ed.2d 462 (1984), the Supreme Court delineated two types of constitutionally protected associational freedoms.

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our con-

stitutional scheme.... In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Id.* at 617–18, 104 S.Ct. at 3249. The Sacco Plaintiffs argue that they were deprived of both of the types of associational rights described in *Roberts*.

First, the Sacco Plaintiffs argue that they were deprived of the right to intimate association. This argument is not supported by the factual allegations of their complaint. Only those Sacco Plaintiffs who were offered work by the Operating Corporation after June of 1995, six of the fifty-seven Sacco Plaintiffs, were sent a letter which conditioned their employment on the provision of references and information concerning the employee's immediate family. (Sacco Compl. ¶ 65; Sacco Memo. at 55–56.) There is no deprivation of those plaintiffs' right to intimate association since they were asked for references only after they were hired. The other fifty-one Sacco Plaintiffs were not hired, and the Sacco Complaint does not allege that the decision not to hire them was influenced in any way by their intimate associations. Accordingly, to the extent the Sacco Plaintiffs assert a § 1983 claim based on a deprivation of their right to intimate associations, it fails to state a claim upon which relief can be granted.

The Sacco Plaintiffs' other freedom of association claim is the alleged deprivation of *Robert's* second type of associational right, the right to associate with others for the purposes of engaging in expressive conduct protected by the First Amendment. *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249–50. The Sacco Plaintiffs argue that they were deprived of their right to associate with those members of their union who opposed the trusteeship. (Sacco Memo. at 55–56.) This claim is indistinguishable from their free speech claim. It is the same claim worded differently. Accordingly it is deficient for the reasons discussed above.

■ The Abramson Plaintiffs' freedom of association claim is different from the Sacco Plaintiffs' claim. The Abramson Plaintiffs argue that they were not hired because of their association with Local 829, not a subgroup of their union that expressed a certain view. They allege that in choosing whom to hire, defendants discriminated against members of Local 829. When taking direct control of hiring, the Operating Corporation decided to have two unions act as collective bargaining agents for the employees it hired, instead of three. Local 829 did not become a collective bargaining agent.

The First Amendment generally protects the rights of employees to associate and participate in labor unions. *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827–28, 60 L.Ed.2d 360 (1979); *DeLoreto v. Ment,* 944 F.Supp. 1023, 1034 (D.Conn.1996). However, the Abramson Plaintiffs do not allege that the Javits Center prevented or opposed unionization of its employees. In fact, the workers presently employed at the Javits Center are apparently union members represented by the two recognized collective bargaining agents. The Abramson Plaintiffs concede that the Javits Center was "not motivated by some generalized, anti-union bias." (Pl.Memo. at 24.) Rather, their claim is that one union was favored over another, and that members of Local 829 were discriminated against. This may provide the basis for an unfair labor practice claim for private employees, but it does not state a claim of violation of the First Amendment. *See Jensen v. Farrell Lines, Inc.,* 625 F.2d 379, 387–90 (2d Cir.1980) (no First Amendment violation where continued employment was conditioned on leaving one union and joining another union of employer's choice).

The cases cited by the Abramson Plaintiffs do not provide authority for their claim. They involve government employers with general anti-union bias. In *DeLoreto v. Ment,* 944 F.Supp. 1023, plaintiffs were employees of the State of Connecticut Judicial Department who were allegedly terminated because they were believed to be union activists. Similarly, the other cases relied on by the Abramson Plaintiffs stand for the general proposition that the First Amendment protects an employee's right to unionize. *Gregorich v. Lund,* 54 F.3d 410 (7th Cir.1995) (research attorney for Illinois court was allegedly fired for organizing union); *Boddie v. City of Columbus, Miss.,* 989 F.2d 745, 748 (5th Cir.1993) (fireman allegedly fired for associating with union members); *Butcher v. City of McAlester,* 956 F.2d 973, 979 (10th Cir.1992) (allegations that city embarked on "union-busting" activities). None of these cases is authority for a First Amendment claim based on a government employer's favoring of one union over another.

In the Supreme Court case cited by the Abramson Plaintiffs, *Smith v. Arkansas State Highway Employees,* 441 U.S. at 464–65, 99 S.Ct. at 1827–28, the union and individual employees sued the Arkansas State Highway Commission for considering only grievances that were submitted directly by employees. Plaintiffs alleged that this procedure denied the union the ability to effectively represent its members. The Supreme Court held that the First Amendment was not violated because "[f]ar from taking steps to prohibit or discourage union membership or association, all that the Commission has done in its challenged conduct is simply to ignore the unions." *Id.* at 466, 99 S.Ct. at 1828. "[T]he First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it." *Id.* at 465, 99 S.Ct. at 1828. The general obligations of employers are not found in the First Amendment. The First Amendment does not require the Javits Center to recognize and bargain with all unions equally. Its decision to recognize unions other than Local 829 does not implicate the First Amendment.

The parties disagree about whether the *Connick* "public concerns" requirement applies to associational claims as well as free speech claims. The circuits are split as to whether public concern is a required element of a freedom of association claim. *See Griffin v. Thomas,* 929 F.2d 1210, 1213 (7th Cir.1991) (*Connick* public concern test applies to free association claims) *Boals v. Gray,* 775 F.2d 686, 691–92 (6th Cir.1985)

(same); *Boddie*, 989 F.2d at 747 (5th Cir. 1993) (free association claim not subject to public concern requirement); *Hatcher v. Board of Public Educ., and Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987). The Second Circuit has not directly addressed the issue. *See Gros v. Port Washington Police District*, 932 F.Supp. 63, 65 (E.D.N.Y.1996) (recognizing the split in authority and the lack of authority from the Second Circuit while holding that public concern requirement should apply to associational rights). I do not reach this issue because the allegations of the complaints do not state a viable claim of violation of First Amendment associational rights regardless of whether a public concern requirement is imposed.

## D. NLRA

The Sacco Plaintiffs assert a § 1983 claim alleging that Pataki, Boyle, Mack, and the Operating Corporation engaged in unfair labor practices in violation of the National Labor–Management Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (2). The abrogation of the collective bargaining agreement allegedly interfered with the Sacco Plaintiffs' relationship with their union and thereby violated the NLRA. (Sacco Compl. ¶¶ 85–92.)

Section 2(2) of the NLRA specifically exempts "any State or political subdivision thereof" from its coverage. 29 U.S.C. § 152(2). When enacting the NLRA, Congress clearly intended to exempt governmental entities from coverage when the government is acting as an employer. In *National Labor Relations Board v. Natural Gas Utility Dist.*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), the Supreme Court held that a county gas utility district was a political subdivision that was no subject to the NLRA. In making its determination, the Court adopted the NLRB's test, which "limited the exemption for political subdivisions to entities that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are re-

sponsible to public officials or to the general electorate." *Id.* at 604–05, 91 S.Ct. at 1749. In support of its determination, the Supreme Court noted that the Utility District had power of eminent domain, was a public corporation under state law, and was exempt from taxes. *Id.* at 605–06, 91 S.Ct. at 1749–50.

■ The Operating Corporation was created directly by New York State as a public benefit corporation, with its Board of Directors appointed by the Governor and members of the legislature. N.Y.Pub.Auth.Law § 2562. The Operating Corporation is exempt from taxation by statute, *id.* § 2568, and subject to the Freedom of Information Law, Public Officers § 84 *et seq.* Furthermore, the officers and employees of the Operating Corporation are subject to the State Ethics Law, Public Officers Law § 73 *et seq.* Accordingly the Operating Corporation is a "political subdivision" that is exempt from the substantive provisions of the NLRA. *See Rose v. Long Island Railroad Pension Plan*, 828 F.2d 910, 915–17 (2d Cir.1987) (holding that the Metropolitan Transportation Authority was a political subdivision of New York State). Since the NLRA does not provide relief for the Sacco Plaintiffs and § 1983 does not itself create substantive rights, the Sacco Plaintiffs' § 1983 claim based on violations of the NLRA is dismissed.

## II. Defendants' Individual Arguments

In addition to collectively arguing that plaintiffs were not deprived of any federal right in violation of § 1983, some of the defendants present arguments in support of their motions to dismiss the § 1983 claims which require individualized consideration.[2]

## A. Pataki

■ Pataki, in addition to arguing that the complaints fail to allege sufficient personal involvement, argues that he is entitled to qualified immunity from claims asserted against him in his individual capacity. Qualified immunity may be invoked by govern-

**2.** Since the only § 1983 claim that remains is the liberty interest claim, and the Sacco Plaintiffs' liberty interest claim is not asserted against the

TSA, I do not reach the TSA's individual arguments for dismissing the § 1983 claims.

ment officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity is meant to prevent excessive and unnecessary disruptions of effective government. Consequently, it can be raised as a defense at the dismissal stage. *See Behrens v. Pelletier,* 516 U.S. 299, ——, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996); *Green v. Maraio,* 722 F.2d 1013, 1018–19 (2d Cir.1983). Official action is not protected by qualified immunity when "in the light of the preexisting law the unlawfulness [is] apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The standard is one of objective reasonableness.

Plaintiffs allege, mostly through press reports, that Pataki intended to take back control of the Javits Center, (Sacco Compl. ¶ 52(a); Abramson Compl. ¶ 51), and believed the contracts with the unions should be declared null and void, (Sacco Compl. ¶ 52(c); Abramson Compl. ¶ 54). Plaintiffs also allege that Pataki made comments about hiring New Yorkers who were previously closed out of jobs because of corruption. (Sacco Compl. ¶ 52(e); Abramson Compl. ¶ 56.) Although plaintiffs do not allege that Pataki personally made the hiring decisions, they allege that he appointed an Inspector General for the Operating Corporation to oversee its operations, (Sacco Compl. ¶¶ 48–51; Abramson Compl. ¶¶ 41–44), and ordered state troopers to keep former employees who had not been rehired from entering the Javits Center, (Sacco Compl. ¶ 52(d); Abramson Compl. ¶ 55).

Since the liberty interest claim is the only § 1983 claim to survive the motions to dismiss, the test for Pataki's qualified immunity defense is whether the law regarding the liberty interest asserted in these cases was clearly established at the time of the conduct complained of—whether a reasonable official would have known that Pataki's alleged actions deprived plaintiffs' of their liberty with-

out due process. Although the liberty interest claims cannot be dismissed on the face of the complaints, these claims are not based on clearly established law.

As discussed above, it is an extremely close question whether plaintiffs allegations sufficiently allege defamation or "stigma plus." Under current law and the law in June of 1995, "stigma plus" generally requires defamation coupled with dismissal from government employment or deprivation of some other legal right. *Neu,* 869 F.2d at 667. Since technically, plaintiffs were not employed by the Operating Corporation, and therefore, plaintiffs were never officially terminated or refused re-employment by the government, the unlawfulness of Pataki's alleged actions was not apparent in June of 1995. It was objectively reasonable for Pataki to believe that his acts did not deprive plaintiffs of liberty without due process of law. Accordingly, Pataki is entitled to qualified immunity for the § 1983 claim asserted against him individually.

■ To the extent claims are asserted against Pataki in his official capacity, those claims are barred by the Eleventh Amendment. The Eleventh Amendment bars any suit for monetary damages against a state official in his official capacity because such a suit is "not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (citations omitted).

## B. The Operating Corporation, Boyle, and Mack

■ The Operating Corporation, Boyle, and Mack argue that the Eleventh Amendment bars all claims against the Operating Corporation and all claims against Boyle and Mack in their official capacities.[3] In determining whether a state-created entity enjoys Eleventh Amendment immunity, the following factors are relevant: (1) how the entity is referred to in the documents that created it, (2) how the governing members are appointed, (3) how the entity is funded, (4) whether

---

**3.** The Abramson Plaintiffs withdrew their claims against Mack at oral argument on June 27, 1997. The Sacco Plaintiffs, however, do not join in that withdrawal. (Letter from Leonard Wagman dated July 10, 1997.)

the entity's function is traditionally one of local or state government, (5) whether the state has a veto power over the entity's actions, and (6) whether the entity's obligations are binding on the state. *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir.1996). If the factors point in opposite directions, the court must consider the Eleventh Amendment's twin rationales—protecting the state treasury and protecting its dignity. *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 47–48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994). In making this inquiry, "the vulnerability of the State's purse [is] the most salient factor." *Id.*

The six relevant factors point in opposite directions. On the one hand, the Operating Corporation's board of directors is appointed by New York's Governor and members of the State Legislature, N.Y.Pub.Auth.Law § 2562, the Operating Corporation is exempt from taxes, *id.* § 2568, and it may receive appropriations for operating expenses from the state upon approval by the Governor and the legislature, *id.* § 2566. On the other hand, the operation of a convention center is not traditionally more of a state function than a municipal one, the state does not appear to have veto power over most of the Operating Corporation's actions, *id.* § 2563, and perhaps most importantly, N.Y.Pub. Auth.Law § 2567 provides that the "obligations of the corporation shall not be debts of the state, and the state shall not be liable thereon, and such obligations shall not be payable out of any funds other than those of the corporation."

In holding that the Port Authority did not enjoy Eleventh Amendment immunity, the Supreme Court emphasized the fact that the Port Authority was generating its own revenue and paying for its own debts such that recovery of damages against it would not affect the States' solvency or dignity. *Hess*, 115 S.Ct. at 406, 513 U.S. at 51–53. In support of its motion to dismiss, the Operating Corporation argues that because the enabling legislation provides for annual appropriations by the legislature to cover operating expenses, there is "a very real possibility that a monetary judgment against it would have an impact on the

state treasury." (Operating Corp. Sacco Memo. at 43.) The Operating Corporation does not otherwise elaborate on its financial condition. Since the burden of proving immunity is on the defendant and the enabling legislation clearly provides that the Operating Corporation's debts are not attributable to New York State, the claims against the Operating Corporation, Boyle, and Mack cannot be dismissed at this stage on Eleventh Amendment grounds.

## C. The Union Defendants

■ Local 807, IBT, Carey, and Brown (collectively "Union Defendants") argue that no § 1983 claim can be maintained against them because they are not state actors and did not act under color of state law. A private party may be liable under § 1983 only if it conspired with a state actor to violate federal rights. *Adickes v. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970). Thus, the Sacco Plaintiffs must allege facts "tending to show agreement and concerted action between the private party and the state actor." *Studifin v. N.Y.C. Police Dept.*, 728 F.Supp. 990, 993 (S.D.N.Y.1990).

The Sacco Plaintiffs make the conclusory allegation that the Union Defendants failed to protect the Sacco Plaintiffs' rights and "participated in" secret negotiations to abrogate the old collective bargaining agreement and to bar the Sacco Plaintiffs from the Javits Center. (Sacco Compl. ¶ 140.) Furthermore, on June 29, 1995, the Union Defendants allegedly entered into a secret agreement with the Operating Corporation which provided that Local 807 would immediately execute an agreed-upon collective bargaining agreement after the old one was abrogated. (*Id.* ¶ 58.) Unlike all the prior collective bargaining agreements, the last agreement was not negotiated or ratified by the rank and file members of 807. (*Id.* ¶ 59.) In addition, the Sacco Plaintiffs allege that since the take-over in June of 1995, IBT, Local 807 Carey, and Brown have continued to take actions to remove the Sacks plaintiffs from the seniority list and to reduce their work opportunities. (*Id.* ¶ 77(a)–(g).) They have also allegedly blocked the Sacco Plain-

tiffs' participation in union elections. (*Id.* ¶ 78.)

These allegations do not sufficiently plead a conspiracy between the Union Defendants and the state to deprive plaintiffs of their liberty without due process. There are no factual allegations that the Union Defendants had any authority or role in choosing the employees hired by the Javits Center after June of 1995. The allegations that Local 807 entered into a new collective bargaining agreement without consulting its rank and file members and was not able to prevent the Javits Center's abrogation of the old collective bargaining agreement with the TSA do not sufficiently establish a conspiracy between the Union Defendants and the Javits Center to deprive the Sacco Plaintiffs of liberty. Without other factual allegations, the § 1983 claims against the Union Defendants must be dismissed for failure to state a claim upon which relief can be granted.

### III. The Sacco Plaintiffs' Miscellaneous Claims.

#### A. § 1985

■ In addition to their § 1983 claims, the Sacco Plaintiffs also assert a claim under 42 U.S.C. § 1985(3).[4] To state a § 1985(3) claim, the Sacco Plaintiffs must allege that defendants (1) engaged in a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or equal privileges and immunities under the laws, (3) acted in furtherance of the conspiracy, and (4) deprived such person or class of persons of the exercise of any right or privilege of a citizen. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). A § 1985(3) claim requires a class-based animus depriving someone of equal privileges and immunities under the law. *Keating v. Carey*, 706 F.2d 377, 379 (2d Cir.1983).

The Sacco Plaintiffs argue that they were discriminated against in violation of § 1985(3) because of their opposition to the trusteeship

imposed on Local 807. Defendants allegedly conducted a politically-motivated purge to rid the Javits Center of those who opposed the trusteeship. The Sacco Plaintiffs argue that such political animus can satisfy the class-based animus requirement of § 1985. However, because of the origin of § 1985 as a mechanism to combat the Reconstruction-era Klu Klux Klan, the Supreme Court has expressed doubt as to whether any nonracial class can satisfy the class-based animus requirement of § 1985(3). *See Carpenters v. Scott*, 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983) ("[I]t is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans.")

In addition, the Supreme Court has held that anti-union animus as well as other animus based generally upon economic views or commercial interests are beyond the scope of § 1985(3) *Id.* Although classes based on political associations have, in limited situations, satisfied the class-based animus requirement of § 1985(3), *see Keating v. Carey*, 706 F.2d at 387–88 (holding that Republicans are a protected class under § 1985(3)); *NY State National Org. v. Terry*, 886 F.2d 1339, 1359 (2d Cir.1989) (women seeking abortion-related medical services are a protected class under § 1985(3)), the scope of § 1985(3) cannot be broadened to include protection of a faction of a local union that opposes the imposition of a trusteeship. Accordingly, the Sacco Plaintiffs' 1985(3) claim is dismissed.

#### B. New York Constitution

■ The Sacco Plaintiffs also assert a claim against Pataki under the New York State Constitution. They allege that Pataki's "taking over and reorganizing" of the Javits Center after unsuccessfully seeking legislation that would require employees at the Javits Center to obtain licences from a state agency violated the New York State Constitution's separation of powers doctrine. (Sacco Compl. ¶ 129–37.) Article III, Section 1 of the New York State Constitution provides

---

4. The Abramson Plaintiffs also asserted a § 1985 claim, but withdrew it at oral argument on June 27, 1997.

that "[t]he legislative power of this state shall be vested in the senate and assembly." Article IV of Section 1 provides that "[t]he executive power shall be vested in the governor." Furthermore, Article IV, Section 3 provides that the governor "shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed."

The New York legislature created the Operating Corporation as a public benefit corporation, authorizing it to "appoint such officers, agents and employees as it may require for the performance of its duties, and to fix and determine their qualifications, duties and compensation." N.Y. Public Authorities Law § 2563(8). The legislature's subsequent refusal to act on Pataki's proposal to require a license for employment at the Javits Center cannot be interpreted as a revocation of the governor's broad authority to execute the Public Authorities Law that created the Javits Center. *See Bourquin v. Cuomo,* 85 N.Y.2d 781, 787–88, 628 N.Y.S.2d 618, 622, 652 N.E.2d 171 (1995) (holding that inferences should not be drawn from legislative inaction). Therefore, the Sacco Plaintiffs fail to allege a violation of the New York State Constitution.

■ In any event, a suit in federal court against a state official for violations of state law is barred by the Eleventh Amendment. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 103–06, 104 S.Ct. 900, 909–11, 79 L.Ed.2d 67 (1984). Although there are limited exceptions to the Eleventh Amendment's prohibition, *see Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974), those exceptions do not apply in this case. Accordingly, the Sacco Plaintiffs' claim against Pataki based on the New York State Constitution is dismissed.

## C. Union's Duty of Fair Representation

■ The Sacco Plaintiffs assert against the Union Defendants a claim of breach of the duty of fair representation. (Sacco Compl. ¶¶ 138–143.) They allege that the Union Defendants failed to protect the Sacco Plaintiffs' "seniority and other contractual

rights" under the old collective bargaining agreement. (*Id.* ¶ 139.) To state a claim of breach of the duty of fair representation, the Sacco Plaintiffs must allege that the Union Defendants' acts were "arbitrary, discriminatory or in bad faith." *Air Line Pilots Assoc., Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1129, 113 L.Ed.2d 51 (1991). Such acts are arbitrary only if, in light of the factual and legal landscape at the time, it so "so far outside a 'wide range of reasonableness' . . . as to be irrational." *Id., quoting Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). A union's discriminatory conduct violates its duty of fair representation if it is "invidious." *Id.* at 81, 111 S.Ct. at 1137. Bad faith requires a showing of fraud, deceitful, or dishonest conduct. *Aguinaga v. United Food and Commercial Workers Int'l Union,* 993 F.2d 1463, 1470 (10th Cir.1993).

The Sacco Plaintiffs rely primarily on the conclusory allegation that the Union Defendants "participated in, among other things, the secret negotiations to abrogate the Agreement and to bar the plaintiffs from the Javits Center." (Sacco Compl. ¶ 140.) In support of this conclusion, they allege through a newspaper article dated June 23, 1995 that Carey announced that Local 807 had reached an agreement with Boyle and stated that "[a]ccess to work [would] be based on seniority—not nepotism that allowed local officials to steer job opportunities to cronies and criminals . . ." (*Id.* ¶ 53.) In addition, the Sacco Plaintiffs allege that Local 807 entered into a collective bargaining agreement with the Javits Center without the participation or ratification of the rank and file members of the union. (*Id.* ¶¶ 58–59.)

The factual allegations of the complaint do not show that the Union Defendants participated directly in the abrogation of the old collective bargaining agreement with the TSA or in the Javits Center's choice of whom to hire. On the contrary, the Sacco Complaint alleges that "Pataki, Boyle and [the] Operating Corporation herein abrogated the Agreement by taking direct control of hiring at the Javits Center," (*id.* ¶ 55), and concedes that "the exact mechanism by which said

defendants originated and planned this abrogation of the Agreement is presently unknown by plaintiffs . . .", (*id.* ¶ 56).

The Sacco Plaintiffs' factual allegations boil down to the Union Defendants' failure to prevent the Javits Center from taking direct control of hiring and failure to preserve the seniority provision of the old collective bargaining agreement with the TSA. These allegations do not contain all the essential elements of a legally cognizable claim of breach of the duty of fair representation. The Union Defendants' failure to prevent the abrogation of the old collective bargaining agreement or to enforce its seniority provision cannot be the basis of a claim of breach of the duty of fair representation. The old collective bargaining agreement was with the TSA, not the Javits Center. After the Javits Center decided to hire its employees directly instead of through the TSA, the old collective bargaining agreement did not apply to work at the Javits Center. The Union Defendants did not have the power to enforce the seniority provision or any other rights under the old collective bargaining agreement. Since Local 807 was powerless to prevent the Javits Center from taking direct control of hiring or to enforce the provisions of the old collective bargaining agreement, their failure to do so is not arbitrary, discriminatory, or in bad faith.

Finally, the Sacco Plaintiffs argue that the Union Defendants breached their duty of fair representation in negotiating the collective bargaining agreement with the Javits Center. Although this claim is not clearly articulated, stating it in the light most favorable to the Sacco Plaintiffs, the claim is that when Local 807 negotiated a collective bargaining agreement which failed to preserve the seniority provision of the old collective bargaining agreement with the TSA, those members of Local 807 who were on the old seniority list were discriminated against.

For this argument, the Sacco Plaintiffs rely primarily on *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138 (2d Cir.1994). Unlike the claims against the union in *Tuscan Dairy Farms*, there is no allegation in the Sacco Complaint of misrepresentations by Local 807 or any other facts tending to show

bad faith. Accordingly, the Union Defendants' motion to dismiss the claim of breach of the duty of fair representation is granted.

### D. Breach of Collective Bargaining Agreement

■ As their tenth claim, the Sacco Plaintiffs sue the TSA for breach of the collective bargaining agreement and violation of § 301 of the NLRA, 29 U.S.C. § 185, by abrogating the collective bargaining agreement. (Sacco Compl. ¶¶ 144–46.) The collective bargaining agreement sets forth procedures to govern the selection of workers for trade shows under contract with the TSA. It does not require the TSA to obtain employment for plaintiffs at the Javits Center. The Operating Corporation decided to take direct control of hiring at the Javits Center, and there are no factual allegations in the Sacco Complaint that suggest that the TSA participated in the Operating Corporation's decision to abrogate the collective bargaining agreement. On the contrary, the Sacco Complaint alleges that the Operating Corporation and Pataki interfered with the TSA's business relationship with the unions by abrogating the collective bargaining agreements. (Sacco Compl. ¶ 55.) Accordingly, the Sacco Plaintiffs' breach of contract claim and their claim under § 301 of the NLRA against the TSA must be dismissed.

■ In the alternative, the Sacco Plaintiffs assert the same breach of contract claims against the Operating Corporation on the theory that the Operating Corporation was the successor of the TSA as a party to the original collective bargaining agreement. (Sacco Compl. ¶¶ 147–49.) The Sacco Complaint does not allege any facts that support the assertion that the Operating Corporation is the successor to the TSA and thereby assumed the TSA's obligations under the old collective bargaining agreement. On the contrary, the Sacco Complaint alleges that the Operating Corporation abrogated the old collective bargaining agreement and subsequently entered into a new one directly with Local 807. Accordingly, the Sacco Plaintiffs' eleventh claim must be dismissed as well.

### Conclusion

For the foregoing reasons, all of plaintiffs' claims are dismissed except the § 1983 claims for deprivation of liberty without due process of law by the Sacco Plaintiffs against the Operating Corporation, Boyle, and Mack and by the Abramson Plaintiffs against the Operating Corporation and Boyle.

SO ORDERED.