Thomas SACCO, et al., Plaintiffs,

v.

George E. PATAKI, et al., Defendants.

Judith Abramson, et al., Plaintiffs,

v.

George E. Pataki, et al., Defendants.

Nos. 95 Civ. 8627(MGC),
96 Civ. 9291(MGC).

United States District Court,
S.D. New York.

Sept. 25, 2000.

---

11. *Id.* at 282–87.

12. *Id.* at 286–87.

Law Offices of Charles L. Weintraub, New York City by Charles L. Weintraub, Snow Becker Krauss, P.C., New York City by Leonard Wagman, Atea Martin, for Sacco Plaintiffs.

Brune & Richard, LLP, New York City by Hillary Richard, Susan E. Brune, Nina M. Beattie, for Abramson Plaintiffs.

Proskauer Rose, LLP, New York City by Steven E. Obus, Charles S. Sims, Tamar Niv, for Defendants.

## *OPINION*

CEDARBAUM, District Judge.

These two actions were filed pursuant to 42 U.S.C. § 1983. Each action has multiple plaintiffs. The sixty-two plaintiffs in *Thomas Sacco, et al. v. George E. Pataki, et al.*, 95 Civ. 8627, are current or former members of the Truck Drivers Local Union 807 ("Local 807") of the International Brotherhood of Teamsters (the "International"). The two hundred plaintiffs in *Judith Abramson, et al. v. George E. Pataki, et al.*, 96 Civ. 9291, are current or former members of Local 829 of the Exposition Worker's Union. Neither of these actions is a class action. Although both amended complaints repeatedly refer to "plaintiffs" collectively, each individual plaintiff has the burden of proving his or her claim.

All except one of plaintiffs' claims have been dismissed. *Sacco v. Pataki*, 982 F.Supp. 231 (S.D.N.Y.1997). The only remaining claims in these related actions are that each plaintiff was deprived of a liberty interest without due process of law in violation of the Fourteenth Amendment. Each plaintiff claims deprivation of a liberty interest by state officials who made highly publicized statements about corrup-

tion at the Javits Convention Center at a time when those state officials denied each plaintiff employment at the Javits Center.

Defendants New York Convention Center Operating Corporation ("NYCCOC"), Robert Boyle, President and CEO of NYCCOC, and William Mack,[1] Chairman of the Board of Directors of NYCCOC, move for summary judgment on the ground that plaintiffs are unable to prove essential elements of their claims. Defendants Boyle and Mack also move for summary judgment on the ground of qualified immunity. For the reasons that follow, the motions are granted.

## UNDISPUTED FACTS

### BACKGROUND

Plaintiffs in both actions are union members who formerly worked at the Javits Center, but did not obtain employment there after hiring at the Javits Center was reorganized by the State of New York.

The Javits Center is a large convention hall established in 1986 by the State of New York. NYCCOC is a New York public benefit corporation created by the State to operate the Javits Center. N.Y. Pub. Auth. Law §§ 2560–72. Prior to June 30, 1995, trade shows held at the Javits Center were organized by trade show contracting companies.

Prior to June 30, 1995, private trade show companies, not NYCCOC, hired the labor necessary to handle freight and erect displays for each trade show held at the Javits Center. Trade show companies typically hired labor on an as-needed basis from three labor unions, members of two of which are plaintiffs in these related actions. Union members seeking work would shape up at the Javits Center on the day of a trade show. Those needed for the job were hired by the trade show companies in accordance with collective bargaining agreements with the unions. Seniority lists determined hiring priority.

The Javits Center was confronted with allegations of corrupt labor practices as early as 1990. One newspaper article reported the long history of allegations that organized crime had a substantial hold on the Javits Center:

> In 1990 ... one Manhattan federal prosecutor called [the Javits Center] "a hiring hall for mobsters and former convicts." In 1992, 23 center employees were indicted for "labor union corruption and theft." *The Mob's Glass House*, New York Magazine, Jan. 9, 1995.

On February 24, 1995 another article reported:

> Plagued by shakedowns, thefts and union-linked violence since it opened in 1986, the Jacob Javits Convention Center has become the shame of the city— an embarrassing symbol of large-scale corruption. Investigators say the glittering glass palace is a hiring hall for mobsters—a virtual subsidiary of the Genovese crime family. *Blue Moonlighting*, New York Post, Feb. 24, 1995.

On March 8, 1995, the International took control of Local 807, the union to which the Sacco plaintiffs belong, and announced that outside trustees would oversee Local 807. The International president, Ron Carey, stated that "[c]orruption at the Javits Center and Local 807 is robbing this city." *Teamsters Seize Local on Costs at Javits Center*, New York Times, Mar. 9, 1995. The International had acted on reports that jobs at the Javits Center "went to well-connected union members, sometimes ex-convicts with ties to organized crime." *Id.*

The Javits Center was also criticized for high labor costs. As an article in the *New York Times* explained:

> The most frequent complaint from show managers and exhibitors is the high cost of setting up a trade show—more than in any other American city. "Even if it takes two seconds to get something done, you have to pay for a minimum of one hour and you might have to use

1. Only the plaintiffs in the *Sacco* action are asserting claims against Mack.

three people," said Dr. Howard B. Mennell, who was in charge of a dental trade show in November. *Unions at Javits Center Are Accused of Abuses*, New York Times, Jan. 21, 1991.

These high costs were blamed on union control of hiring:

> Officials say the center has no control over the hiring of union employees, leaving the unions with extraordinary power—and the center with escalating labor costs. *Blue Moonlighting*, New York Post, Feb. 24, 1995.

Such costs made the Javits Center the most expensive exposition center in the country. *Id.*

The State took action in response to allegations of corruption and inflated labor costs in June of 1995. On June 30, 1995, NYCCOC announced a fundamental change in hiring practices at the Javits Center. Under the new arrangement, NYCCOC itself would hire labor for the Javits Center, and those hired would be considered state employees. *Javits Center Is Hiring, and Crowds Turn Up*, New York Times, July 1, 1995. On June 30, 1995, NYCCOC first interviewed union members who had worked at the Javits Center before. Union members who had not worked at the Javits Center waited in line for interviews for a chance at Javits Center work that they had not been able to obtain prior to the NYCCOC takeover. *Id.* On July 1, 1995, job interviews were conducted with members of the general public. *Id.*

NYCCOC hired or offered work to nine of the plaintiffs in these related actions. (Suppl. Sacco Submission; Suppl. Abramson Submission Ex. G.) The employment histories of the remaining plaintiffs following the state takeover of hiring at the Javits Center vary, but the majority obtained employment in the trade show industry following the state takeover.

---

**2.** It should also be noted that Governor Pataki is no longer a defendant in these actions. Statements made by the Governor are, there-

## THE STATEMENTS

The statements of which each plaintiff complains did not name any particular plaintiff. The statements appeared in news coverage of the change in hiring practices at the Javits Center. Each plaintiff contends that defendants' statements to the news media led the public to believe that any worker at the Javits Center who was not hired by the State after the takeover had ties to organized crime. Because the statements that each plaintiff identifies are repetitive, in that different members of the media reported the same event, every statement identified is not repeated here.[2]

Approximately one week before the State took control of hiring at the Javits Center, the *Daily News* reported that investigations by state officials revealed that 60% of "Javits Center exposition workers" had past felony convictions. *Bid to Cut Mob from Javits*, Daily News, June 21, 1995. The next day, the same newspaper reported that "Javits officials have chosen a top-secret 'D–Day,' when all trade show employees will start working for the state and measures to dump mob-linked workers will begin." *Javits Center Labor Reform to Start*, Daily News, June 22, 1995. Describing the plan, the *New York Times* reported:

> Although some of the workers may come from the current union rolls, officials said the jobs will be open to anyone, and they expect that about 200 carpenters, teamsters and exposition employees with tainted backgrounds will be permanently removed from the workforce.

> "We want to clean up the enormous featherbedding that we now have as well as the notorious presence of organized crime," said Robert E. Boyle, the center's new executive director. "Whether we will succeed in doing that is still questionable." *State to Hire a Work-*

---

fore, not actionable. They are provided only for context.

*force at Javits Hall,* New York Times, June 24, 1995.

On July 1, 1995, the day NYCCOC completed interviews, Boyle was interviewed by a television news reporter. In that interview Boyle stated, "Monday, I hope to be able to tell you that this Center is mob free." NY1 News at 9:30 p.m., July 1, 1995.

On July 6, 1995, after the State had hired a permanent workforce for the Javits Center, Governor Pataki and Boyle held a press conference at the Javits Center. The press release issued by the Governor's office summarizes the statements that Pataki and Boyle made to the press at that press conference. The press release stated in pertinent part:

**GOVERNOR PATAKI ANNOUNCES SWEEPING REFORMS AT THE JACOB K. JAVITS CONVENTION CENTER**

*New labor contracts will root out organized crime, eliminate featherbedding and return Center to national preeminence.*

Governor George E. Pataki today announced a series of major reforms that will sweep out corruption, eliminate featherbedding and return the Jacob K. Javits Convention Center to preeminence among the country's great exhibition halls.

. . . . . .

"Today we send a clear message to those in organized crime that this great exhibition hall is no longer your hiring hall," the Governor said.

. . . . . .

**II. Sweep Out Corruption:**
Organized Crime has largely controlled hiring at the Javits Center, forcing labor costs to skyrocket.

. . . . . .

"Previously, independent contractors have supplied the labor force, effectively giving Organized Crime—and not Javits management—control over the rules used to run the Convention Center. The steps taken by Governor Pataki re-

turn control of the Convention Center to its management, and to the people of New York State—and take it away from organized crime," Boyle said. (Sacco Pls. Ex. 10.)

The substance of these statements was reported on four local television news programs that night. (Sacco Pls. Ex. 29.)

Some media coverage of the State's takeover of hiring continued into the weeks following the July 6, 1995 press conference. On July 11, 1995, Boyle stated in a television interview that "[a]t any given time on our floor we have estimated that over 65% of the personnel on the floor were either convicted felons or associated with organized crime." WPIX TV, Ch. 11 News at 11:00 p.m., July 11, 1995.

On July 16, 1995, a *Daily News* article reported the July 6, 1995 press conference, describing the State's takeover of hiring at the Javits Center. In that article, Boyle stated that "[s]tep one of his plan . . . was to turn a spotlight on them, . . . [m]ake the roaches run for the corners." *The New Show at Javits,* Daily News, July 16, 1995.

Defendants note that in that same article, Boyle is quoted as saying:

[t]here are innocent victims in this situation. I know it. . . . We haven't closed the door and will continue to hire. . . . But in all honesty, you can't make an omelet without breaking eggs. And there were a lot of other innocent people already hurt by this situation—exhibitors, contractors, the entire populace of the city and state were hurt by the decline in business here. *Id.*

Boyle also explained that the plan was designed to dramatically decrease the total number of employees at the Javits Center, from roughly 1000 to 500. *Javits Center Mob Mop–Up Starts Today,* New York Post, June 28, 1995. Boyle stated:

Having a contingent of state workers on hand will permit the center to eliminate virtually all union-demanded overtime expenses and dramatically reduce the number of workers needed for exhibition

operations.... [T]he 10–to–11–member unionized unloading crews who now work for private exhibition promoters [will] be replaced by two-member state crews. *Id.*

In September, October, and November of 1995, Boyle also sent letters to four members of the New York State Assembly, two U.S. Congressmen, a New York State Senator, and a New York City Councilman in response to their inquiries about NYCCOC's hiring decisions. (Bradford Decl. Ex. A–H.) The letters stated in pertinent part:

> [T]he fact that your constituents were not selected does not mean that the Center regarded them as "criminals" or that they were considered undesirable in any way; it simply means that they were not as desirable, from the Javits Center's perspective, as the other applicants with whom they were competing. Since no hiring process yields perfect results, there may well be qualified individuals who were not offered employment, including some who were employed at Javits before. (*Id.*)

Plaintiffs dispute defendants' contention that these statements neutralize the defamatory effects of those stating that the mob controlled the Javits Center and that a large percentage of the persons who worked at the Javits Center were either convicted felons or associated with organized crime.

## DISCUSSION

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### A LIBERTY INTEREST—"STIGMA PLUS"

Each plaintiff's claim is brought pursuant to 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Each plaintiff claims that defamation by defendants plus loss of employment at the Javits Center was a deprivation of liberty without due process of law in violation of the Fourteenth Amendment.

■ Defamation is not generally actionable under § 1983. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976). However, when false, stigmatizing statements made by the government are accompanied by a tangible injury to the victim of the statements, the injured party may assert a § 1983 claim for deprivation of liberty without due process of law. *Id.*

■ *Paul* has been interpreted "as holding that 'stigma plus' is required to establish a constitutional deprivation." *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). The "plus" requires some tangible injury to plaintiff in addition to stigma. *Id.* at 667. "[T]he deleterious effects which flow directly from a sullied reputation ... includ[ing] the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, [or] self-esteem" are normally insufficient for deprivation of a liberty interest. *Valmonte v. Bane,* 18 F.3d 992, 1001 (2d Cir.1994). Thus, "the 'plus' is not only significant damage to a person's employment opportunities but dismissal from a government job or deprivation of some other legal right or status." *Neu,* 869 F.2d at 667.

Each plaintiff claims that he or she has been deprived of the liberty "to engage in any of the common occupations of life." *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Plaintiffs argue that they have been virtually, or in some cases, completely, foreclosed from employment in the trade show industry by the government's stigmatizing statements. Courts have held that individuals are deprived of liberty when they are foreclosed from employment by some action of the government. "The injured party's liberty is at stake when governmental action places 'on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" *Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 177 (2d Cir.1991) (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707); *see also Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 631 (2d Cir.1996) (holding that plaintiff had been deprived of liberty where, in the context of discharging plaintiff from job as school assistant principal, defendants' "comments ... [were] so harsh as to be likely to persuade any other school board not to hire plaintiff"); *Huntley v. Community Sch. Bd. of Brooklyn,* 543 F.2d 979, 985–86 (2d Cir.1976) (finding a deprivation of liberty where statements made in the context of firing school principal were such that "it [was] unlikely that [plaintiff] would ever have a chance to obtain another supervisory position in the public schools or elsewhere").

*False, Stigmatizing Statements*

In order to succeed in a § 1983 action for foreclosure from employment by defamatory statements of a government employee, a plaintiff must show that the statements complained of were false and that they stigmatized that plaintiff. *See, e.g., Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (dismissing § 1983 liberty interest claim because plaintiff had not alleged that statement defaming him was false); *Kelly Kare,* 930 F.2d at 177 ("To prevail on such a liberty-interest claim, a plaintiff must establish that the information was stigmatizing, false, and publicized by the state actor.").

Plaintiffs do not proffer evidence that the general statements that organized crime had substantial influence at the Javits Center were false. Moreover, at the time of the takeover there was widespread recognition that corrupt practices had kept many honest union members from obtaining steady work at the Javits Center.

The Second Circuit has recognized the importance of not discouraging government officials from publicly explaining their personnel decisions. In *Baden,* 799 F.2d at 833, the court declined to require a name-clearing hearing before termination of a government employee in a public manner, noting "[i]f we were to hold that a government executive's statement of reasons for a discretionary personnel decision automatically triggered a requirement for a formal trial-type hearing, executives will be tempted to refrain from explaining their personnel actions in public, a result contrary to the strong policy of maintaining an informed electorate."

The government, of course, does not have unfettered discretion to make statements for which it has no support. How-

ever, as long as the statements made by government officials commenting on the Javits Center are true, such public comment should not be discouraged even if the generalizations do not accurately portray every individual worker at the Center.

■ The only statement any plaintiff identifies as literally false is Boyle's statement that: "At any given time on our floor we have estimated that over 65% of the personnel on the floor were either convicted felons or associated with organized crime." WPIX TV, Ch. 11 News at 11:00 p.m., July 11, 1995.

Persons hearing the statement would be unlikely to associate it with any particular individual because the statement refers to an extremely large group of 1000 persons. Although this claim is not one for state law defamation, the principles of state defamation law are instructive. Under New York law, the group libel doctrine generally bars individual defamation actions based on statements about large groups of persons because the larger the group, the less likely is any particular member of the group to be associated with the statement. *See Church of Scientology Intern. v. Time Warner, Inc.,* 806 F.Supp. 1157, 1160 (S.D.N.Y.1992) ("[A] defamatory statement directed against a group or class does not generally give rise to a cause of action on behalf of its individual members.") (quoting *Provisional Government of Republic of New Afrika v. American Broadcasting Companies, Inc.,* 609 F.Supp. 104, 108 (D.D.C.1985)).

More than 1000 persons worked at the Javits Center prior to the state takeover, and more than half of those were not hired by the State after the takeover. Boyle's statement that 65% of Javits Center workers were either convicted felons or had ties to organized crime is not sufficiently specific to reasonably be applied to every person not hired after the reorganization. *See Neiman–Marcus v. Lait,* 13 F.R.D. 311, 316 (holding that defamatory, general statement about group of 382 saleswomen did not support defamation claim because "where the group or class disparaged is a large one, absent circumstances pointing to a particular plaintiff as the person defamed, no individual member of the group or class has a cause of action"). "Group defamation may target all or some of the members of a particular group. An attack on some is less likely to associate a particular member of the group with the allegations than an attack on all the members of the same group—to say some members of a law firm are incompetent is less likely to injure the reputation of a particular partner than would the allegation that each and every partner was incompetent." Robert D. Sack. and Sandra S. Baron, *Libel, Slander & Related Problems* 77–78 (2d ed. Supp.1998). *See Brady v. Ottaway Newspapers, Inc.,* 84 A.D.2d 226, 445 N.Y.S.2d 786, 787 (holding that statement that "the entire department" of police officers were at least "accessories after the fact" to acts of planting evidence and "other misdeeds" committed by 18 officers of a department of 53 officers defamed all 53 officers). None of the cases in the 'stigma-plus' line of liberty interest cases has dealt with defamatory statements made about a group of employees. All of the statements explicitly described one particular person. *See, e.g., Roth,* 408 U.S. at 564, 92 S.Ct. 2701; *Donato,* 96 F.3d at 623; *Huntley,* 543 F.2d at 979. In order to demonstrate that any potential employer viewed a plaintiff as one of Boyle's 65% and did not hire that plaintiff as a result, that plaintiff must proffer some evidence that he or she was denied a particular job because the potential employer thought the plaintiff was associated with organized crime.

*"Plus"*

The "plus" element of a stigma plus claim requires that a plaintiff show some "tangible injury" in addition to being stigmatized by the government's defamatory statements. *Neu,* 869 F.2d at 667. This requirement has been met in most cases by dismissal from government employment. As the Second Circuit stated in *Valmonte,* 18 F.3d at 1001, "defamation in conjunction with termination of govern-

ment employment is the clear situation that satisfies the 'stigma plus' test."

Defendants argue that because no plaintiff was a government employee when terminated, none of the plaintiffs could have been deprived of a liberty interest. However, in *Valmonte* the Second Circuit recognized that termination from government employment is not required for a showing that a plaintiff has been deprived of a liberty interest. *Id.* at 922. Valmonte was a child care worker in the private sector whose name was included on a state-created and maintained list of persons against whom complaints of child abuse had been made. State law required employers of child care workers to consult the list before hiring any individual and to explain to the state in writing their reasons for hiring any individual named on the list. Thus, the state placed a burden on potential employers that was so severe that "there [would] be no question in most cases whether the individual's inclusion on the Central Register was a causal factor in the individual's failure to secure employment." *Id.* The *Valmonte* court recognized that when the state creates such a barrier to private employment that an individual is precluded from employment in his or her field, that individual has been deprived of liberty. This case does not present facts as extreme as those in *Valmonte*. Plaintiffs are not foreclosed from employment by any legal impediment.

But, even if termination from government employment were an essential element of an actionable claim, the peculiar facts of this case come very close to such a circumstance. Although plaintiffs were not technically government employees, the government did directly affect their employment at the Javits Center. The State took over hiring at the Javits Center, employing a new workforce to replace the workforce that previously had been hired by private companies. State officials took credit for this new workforce in the news media, calling their plan a "clean sweep." Thus, although plaintiffs were not terminated from government employment, they were terminated as a direct result of a government decision to reorganize the Javits Center.

However, only those plaintiffs who have been foreclosed from employment in which they may utilize their skills or draw upon their experience can establish the "plus" element of their claim. No plaintiff has explained why work in the trade show industry is so specialized that an employee of the trade show industry cannot utilize his or her skills effectively in another industry. The majority of the individual plaintiffs who have provided information about their employment, both at the Javits Center and after the NYCCOC took control of hiring, do not detail the work they performed at the Javits Center.

The amended complaints do provide a general description of plaintiffs' work. The Amended Sacco Complaint states:

> Workers from the Teamsters (including plaintiffs herein), Carpenters, Exhibit Workers and Electrical Workers unions are employed to move the exhibits, displays and merchandise into the Javits Center and to set up the various exhibits, displays and booths at the commencement of a show and to take apart the displays and exhibits and move the disassembled components as well as the merchandise out of the Javits Center when the show is completed. No work is required from these unions while a show is in progress or during periods between breaking down one show and setting up the next. (Sacco Am. Compl. ¶ 30.)

The Abramson complaint explains the work in a similar fashion:

> During these trade show exhibitions, manufacturers and exhibitors set up exhibits, displays and booths to show their wares to commercial buyers and the public. (Abramson Am. Compl. ¶ 12.) Local 829 workers fell into 3 basic categories: expos, checker/helpers and foremen. The expos were primarily responsible for physically moving crates, furniture and other materials from the loading docks to the appropriate exposi-

tion areas within the Javits Center. The helper/checkers were primarily responsible for ensuring that the proper materials were delivered to the Center, and for directing the materials that were to be delivered to particular areas by the expos. The foremen oversaw the entire operation, determined the necessary number of workers, and were responsible for payroll. (Abramson Am. Compl. ¶ 21.)

Plaintiffs moved items into and out of the Javits Center, constructed displays, and planned and supervised these activities.

Plaintiffs have not shown that the use of these skills is restricted to the trade show industry. Plaintiffs are not obligated to find work outside their field. *See Donato,* 96 F.3d at 632 (citing *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), for the proposition that due process protects the freedom "to engage in any of the common occupations of life"). However, plaintiffs cannot prove the "plus" element of their "stigma plus" claims merely by showing that they cannot obtain employment in one of many industries that employs persons with their skills. For example, a mover who happens to be employed in the trade show industry is not foreclosed from employment in his field as long as he can find work as a mover in another industry. *See Baden v. Koch,* 799 F.2d 825, 831 (2d Cir.1986) (noting that doctor who worked as Chief Medical Examiner could find work as a doctor in another position in either the public or private sector).

All of the plaintiffs were invited at the oral argument of this motion to submit detailed information about their employment status. Even with these additional submissions, none of the plaintiffs has raised a disputed issue of material fact on the "plus" element of his or her claim. The plaintiffs fail to raise a disputed issue of fact with respect to this element for a variety of reasons. Many plaintiffs have failed to provide any information about their employment status and, therefore, fail to raise a disputed issue of fact with respect to the essential "plus" element.

Many others were hired or offered work at the Javits Center after the NYCCOC took control of hiring. These plaintiffs either work for the Javits Center or were offered work at the Javits Center and, therefore, cannot raise a question of fact regarding their foreclosure from employment in their field. They have not been foreclosed.

Several other plaintiffs have found work in the trade show industry, although they work fewer hours than they did before the State reorganized the Javits Center. However, the fact that a plaintiff now works fewer hours than before is not sufficient to establish "plus." It is undisputed that the vast majority of work in the trade show industry in New York City is at the Javits Center. (McNamee Decl. ¶¶ 8–9; Giantiempo Decl. ¶ 9.) However, plaintiffs are not deprived of a liberty interest because they cannot have the best job in their field. In *Empire Transit Mix, Inc. v. Giuliani,* 37 F.Supp.2d 331, 336 (S.D.N.Y.1999), for example, the plaintiff concrete supplier did not state a claim that it had been deprived of a liberty interest when the City of New York terminated its contracts with the plaintiff following "negative" news reports about the plaintiff. The court held that the plaintiff had not stated a claim for the deprivation of a liberty interest even though "a significant part of [plaintiff's] business ha[d] involved projects for the City." *Id.* The State of New York is not obligated to provide any plaintiff with a job at the Javits Center. I have previously dismissed plaintiffs' claims that they had a property interest in Javits Center employment. *Sacco,* 982 F.Supp. at 231.

Several plaintiffs have provided affidavits stating that they have been unable to find work. However, they have not provided any details regarding where they looked for work or why they were denied employment. Because of the generalized nature of the stigmatizing statements, a causal connection between the statements and any particular plaintiff's difficulty in finding work cannot be assumed. Each

plaintiff must show that Boyle's statement individually affected him or her.

Only two plaintiffs state that they applied for a particular job, but were not hired because that employer associated defendants' statements with them. The first, *Sacco* plaintiff James Tansey, Sr., states that he "tried to get a job with a trucking company but ... was told they would not hire me because of the bad publicity about the workers at Javits." (Tansey, Sr. Aff.¶ 8.) However, Tansey cannot prove the falsity of Boyle's statement as applied to him because he has, in fact, been convicted of a crime. (Niv Decl. Ex. L.) A false statement about him is an essential element of Tansey's claim.

The second, *Sacco* plaintiff Ernest Augostino, explains that he applied for jobs with employers looking for Hi–Lo drivers including, "Roadway Trucking, Huxley Envelope, Home Depot, Airborne Express, Emory Freight, and U.S. Steel." (Augostino Aff. ¶ 7.) He continues, "[o]nce they learned that I had worked at the Javits Center, they were not interested in hiring me." However, Augostino ultimately found a job as a driver for a hotel. (*Id.* at ¶ 9.) Therefore, he has not been foreclosed from employment in his field and cannot show the essential "plus" element of his claim.

*QUALIFIED IMMUNITY*

Boyle and Mack have moved for summary judgment on the claims against them in their individual capacities on the ground of qualified immunity. Qualified immunity protects government officials from being sued for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *Harlow* establishes a two part test for qualified immunity. First, a court must determine whether the right at issue was clearly established at the time the defendant acted. As the Court explained in *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105

S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." The second prong of the test asks whether it was objectively reasonable for the defendant to believe that his conduct did not violate a clearly established right.

I have previously held that the liberty interest asserted in this case was not clearly established in June of 1995. *Sacco,* 982 F.Supp. at 244. Therefore, defendants Boyle and Mack cannot be expected to have known that their conduct deprived plaintiffs of a liberty interest without due process of law.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

SO ORDERED.