278 F.3d 93
 Judith ABRAMSON et al., Plaintiffs-Appellants,
v.
George E. PATAKI, Individually and in his capacity as the Governor of the State of New York and William L. Mack, Individually and in his capacity as Chairman of the Board of Directors of the New York Convention Center Operating Corporation, Defendants,
New York Convention Center Operating Corporation; Robert E. Boyle, Individually and in his capacities as the President and Chief Executive Officer of the New York Convention Center Operating Corporation and a Special Assistant to the Governor of the State of New York, Defendants-Appellees.
 Docket No. 00-9348.
 United States Court of Appeals, Second Circuit.
 Argued May 25, 2001.
 Decided January 23, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Kevin Costello, Flushing, NY, for Plaintiffs-Appellants.
 Steven E. Obus, Proskauer Rose LLP, New York, NY, for Defendants-Appellees.
 Before WALKER, Chief Judge, KATZMANN, and CUDAHY,* Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 The plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York (Miriam Goldman Cedarbaum, Judge), entered October 10, 1997 and September 25, 2000, dismissing their complaint brought under 42 U.S.C. § 1983. This judgment was based on two orders issued by the district court; the first granted in part defendants' motion to dismiss, Sacco v. Pataki, 982 F.Supp. 231 (S.D.N.Y.1997), and the second granted defendants' motion for summary judgment, Sacco v. Pataki, 114 F.Supp.2d 264 (S.D.N.Y.2000).
 
 
 2
 The appellants, 191 members of Local 829 of the Exposition Worker's Union, filed their complaint in December 1996, and this action was consolidated with a similar one brought by the present and former members of the Truck Drivers Local Union 807 of the International Brotherhood of Teamsters.[1] The appellees are the New York Convention Center Operating Corporation (NYCCOC) and Robert E. Boyle, President and Chief Executive Officer of the NYCCOC.[2] The complaint challenges various changes in hiring practices, which resulted in plaintiffs not being hired for work at the Javits Center, and various statements made by the appellees in the context of publicized allegations of corruption and mob infiltration at the Center.
 
 
 3
 The appellants appeal from the district court's dismissal of their claim that the NYCCOC deprived them of a property interest in their employment at the Javits Center without due process. They also appeal the grant of summary judgment on their claim that statements made by the appellees to the media deprived them of a liberty interest in other employment without due process.
 
 
 4
 For the reasons set forth below, we affirm the judgment of the district court.
 
 
 5
 Because we are reviewing defendants' motion to dismiss and a motion for summary judgment, we recount and review the facts as alleged in the complaint in the light most favorable to the plaintiffs in a manner appropriate to the nature of the motion. McPherson v. Coombe, 174 F.3d 276, 279-80 (2d Cir.1999); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir.1992), cert. denied, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993).
 
 
 6
 The NYCCOC is a public benefit corporation created by statute for the purpose of operating and maintaining the Javits Center — a large convention hall in New York City established in 1986. N.Y. Pub. Auth. Law §§ 2560-2572 (McKinney 1995). The NYCCOC enters into license agreements with various exhibitors entitling them to use the space at the Javits Center for trade shows and other events. Prior to the reorganization giving rise to the present litigation, the show managers of the tenant exhibitors usually hired general contractors to help move freight, erect and dismantle exhibit booths and lay rugs. Most of these contractors were members of the New York Trade Show Contractors' Association (TSA), which has had collective bargaining agreements with three different unions. The contractors typically selected employees from one of these unions for the various jobs maintained by the exhibitors. The appellants are members of one of these unions, Local 829 of the Exposition Worker's Union.
 
 
 7
 In November 1985, the NYCCOC entered into a memorandum of understanding (MOU) with a number of unions, including Local 829. The MOU provided, inter alia, that the work on exhibitions at the Javits Center would be performed by workers represented by certain specified unions — including Local 829. The appellants argue that this memorandum created a protectable property interest by "requiring a comprehensive system for employment of the plaintiffs pursuant to collective bargaining agreement [sic] and by providing that the Memorandum would not be modified or terminated without consent of the parties...." Appellants' Br. at 18.
 
 
 8
 Local 829 had collective bargaining agreements with various trade show contractors. These agreements provided that Local 829 would be the exclusive representative of employees who installed exhibits and booths for Javits Center trade shows and exhibitions.
 
 
 9
 The TSA arranged to provide much of the labor for the trade shows at the Javits Center. But in early 1995, concerns arose (with accompanying publicity) about corruption at the Javits Center and its workers' ties to organized crime. At that time, Governor Pataki and Boyle made public statements indicating their intention to clean up the reported corruption. In June 1995, the NYCCOC decided to hire workers directly instead of through the contractors, and to enter into its own collective bargaining agreements with unions certified to represent the new workers. The new labor force would be divided into two bargaining units and would consist of members of two unions, one representing employees handling freight and the other for booth erectors. Boyle also distributed a letter indicating his intent to "formally disavow and terminate" the MOU.
 
 
 10
 Local 829 agreed to the reduction in the number of unions involved from three to two, after seeking and receiving assurances that its own members would be rehired. In this recognition agreement, the NYCCOC pledged to recognize two unions as the collective bargaining representatives for the new workforce upon a showing that the majority of hired or rehired employees were members of those unions. On June 30, 1995, the appellants filled out applications for employment at the Javits Center. But the NYCCOC instead hired hundreds of new workers, not members of any of the unions that had previously been utilized for the Javits Center workforce. Only 15 to 20 of the approximately 200 members of Local 829 who applied were rehired. In July 1995, Local 829 requested arbitration pursuant to the recognition agreement with the NYCCOC that it had signed (agreeing to the reduction in the number of bargaining units). The union alleged that the NYCCOC had discriminated against it in the hiring and certification processes, in violation of the recognition agreement. After the requested arbitration was concluded without a requirement that the NYCCOC recognize or hire any of its members, appellants brought the instant suit.
 
 I.
 
 11
 We review de novo a district court's dismissal of a complaint for failure to state a claim, taking all factual allegations as true and construing all reasonable inferences in favor of the plaintiff. Conley v. Gibson, 355 U.S. 41, 45 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir.1999). "Dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Lee, 166 F.3d at 543 (internal citations omitted). The appellants first argue that the district court incorrectly applied this procedure, and erroneously found that the plaintiffs had no protectable property interest in their employment; they had not, therefore, been deprived of property without due process of law.
 
 
 12
 To survive a motion to dismiss, a due process claim under section 1983 must allege the deprivation of a constitutionally protected interest. See Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth., 23 F.3d 636, 639 (2d Cir.1994) (affirming dismissal of a section 1983 claim because plaintiff had no constitutionally protected property interest). In order to have an interest protectable under the Constitution, a person must have a "legitimate claim of entitlement to it." Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). An abstract need, desire or unilateral expectation is not enough. See id. Employees at will have no protectable property interest in their continued employment. See Goetz v. Windsor Cent. Sch. Dist., 698 F.2d 606, 608-9 (2d Cir.1983); see also Roth, 408 U.S. at 578, 92 S.Ct. 2701 (stating that plaintiff had no claim of entitlement to reemployment where he was appointed to faculty position for one-year term only). But a protectable property interest may arise in a situation where an employee may be removed only for cause. See Arnett v. Kennedy, 416 U.S. 134, 151-52, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality). Indeed, in this circuit, a person may possess a protected interest in public employment if contractual or statutory provisions guarantee continued employment absent "sufficient cause" for discharge or he can prove a de facto system of tenure. See Goetz, 698 F.2d at 609.
 
 
 13
 The appellants argue that their property interest was rooted in the MOU, employment procedures and collective bargaining agreements, as well as in statements by the appellees promising future employment. Under the MOU, the appellants argue that the NYCCOC agreed to use the labor of the specified unions, including Local 829, by obligating contractors to employ them. But, as the district court noted, the MOU does not guarantee employment; it simply outlines "certain understandings" between the unions and the NYCCOC. The appellants find their entitlement in the NYCCOC's agreement that the "Memorandum of Understanding shall apply so long as the undersigned unions represent employees working at the Center and will only be reopened, modified or terminated in whole or in part upon the written consent of the Center and the affected union or unions." Appellants' Br. at 17 (quoting the MOU). This, the appellants contend, created a property interest in the expected continuation of employment. However, we reject this contention.
 
 
 14
 First, the MOU does not constitute the sort of guarantee of employment that would rise to the level of a property right. The MOU was only an agreement entered into in 1985 between the Javits Center and a number of unions that had previously represented employees at the New York Coliseum. There are a few things, however, that the MOU does not do: 1) it does not require the NYCCOC to employ any specific workers at the Javits Center; 2) it does not involve the NYCCOC in the hiring of contractors; 3) it does not establish any employment relationship between the NYCCOC and the appellants; and 4) even if it did create such an employment relationship, there is nothing in the MOU to limit the NYCCOC's right to terminate any individual employee. The MOU is a far cry from the sort of contract that has been held to establish a property right in employment. There is no language in the MOU that either expressly or by implication guarantees continued employment absent cause. Thus, under the MOU, individual employees are terminable at will. As this court has made clear, at will employees do not have a protectable property interest in continued employment. See Goetz, 698 F.2d at 608-09 (citing Roth, 408 U.S. at 578, 92 S.Ct. 2701).
 
 
 15
 Second, the NYCCOC had no control over the factors that determined whether individual appellants would be retained. Thus, the fact that the MOU indicated that freight functions would be performed by members of specified unions, including Local 829, does not assist the appellants. Determinations of the status of individual appellants were made by exhibitors who retained the services of general contractors, who in turn decided whom to hire and whom to fire.
 
 
 16
 And finally, Local 829 had agreed in the recognition agreement to abrogate the MOU. The MOU was therefore validly, properly and effectively terminated.
 
 
 17
 The appellants' next contention is that the recognition agreement created a property interest in employment at the Javits Center. They attempt to find such an intent in the statement that "[t]he Javits Center will become the direct employer of the hourly production employees who work at the Center." Recognition Agreement at 1. However, the remainder of this agreement makes clear that this recital is not a promise to employ the appellants. The agreement indicates that the Javits Center will publicize to members of the unions and to the public the availability of work, and that then the Javits Center will, "without discrimination based on union membership or any other prohibited criteria, choose the hourly production work force with which the Center will be operated." Id. The plain language of the recognition agreement shows that it does not create any sort of a property interest in employment at the Javits Center. Even if it had contained a promise to hire the appellants, in this case it would not have created a protected property interest because the NYCCOC's discretion to hire or fire an employee was unlimited. See Walentas v. Lipper, 862 F.2d 414, 419 (2d Cir.1988) (real estate developer had no property interest in his future employment by the city where the selection of him to develop city property was truly discretionary). Ordinarily, there is no constitutionally protected property interest in prospective government employment. See MacFarlane v. Grasso, 696 F.2d 217, 221 (2d Cir.1982); Molerio v. FBI, 749 F.2d 815, 823 (D.C.Cir.1984). Nothing in the case before us suggests that it is out of the ordinary, or special in any way.
 
 
 18
 Next, the appellants attempt to find a property interest in the long-standing practices of the Javits Center. The appellants do not delineate exactly what those long-standing practices are. But, assuming that the Javits Center has always, since its opening in 1985, employed the appellants in its work, that circumstance would not create a protectable interest in their continued employment.
 
 
 19
 Finally, the appellants hope to find a protected property interest in the NYCCOC's assurances to Local 829 officials that the appellants would be rehired directly by the NYCCOC. Of course, not all contractual assurances rise to the level of constitutionally protected property interests. Such property interests are found in "situations which involve contracts with tenure provisions and the like, or where a clearly implied promise of continued employment has been made." Walentas, 862 F.2d at 418. The allegations of the appellants fall far short of claiming tenure. If the simple fact that these employees worked at the Javits Center for a number of years gave them a claim of entitlement, nearly every government employee could claim a property interest in employment.
 
 
 20
 The appellants also contend that the "sham job interviews conducted after termination" did not satisfy the requirement that there must be a hearing before termination of employees who have a property interest in their employment. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Of course, we do not quarrel with this principle, but it has no application here because the claim of a property interest has no support.
 
 II.
 
 21
 Next, the appellants contest the district court's grant of summary judgment to the defendants on their liberty interest claim. Summary judgment is properly granted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 957 (2d Cir.1993). We review the district court's decision de novo. See id.
 
 
 22
 The appellants argue that they were deprived of a constitutionally protected liberty interest without due process of law. Where a state actor fails to rehire an employee, certain circumstances surrounding the non-continuance of employment might give rise to a claim of denial of a liberty interest. See Roth, 408 U.S. at 573, 92 S.Ct. 2701. Such circumstances might include situations where the reasons for termination or resignation were given a public airing which impaired the prospects of the employee for other employment. See Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630-31 (2d Cir.1996); White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1062-63 (2d Cir. 1993); Easton v. Sundram, 947 F.2d 1011, 1016-17 (2d Cir.1991); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.1989). Specifically, the plaintiffs are required to meet a "stigma-plus" standard, which demands that the plaintiffs establish 1) that they were defamed; and 2) that the defamation occurred in the course of the termination of governmental employment or was coupled with a deprivation of a legal right or status. See Easton, 947 F.2d at 1016; O'Neill v. City of Auburn, 23 F.3d 685, 691 & n. 2 (2d Cir.1994). To show defamation, the plaintiffs must show that the statements complained of were false; that they stigmatized the plaintiffs; and that they were publicized. See Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 177 (2d Cir.1991); see also Codd v. Velger, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (holding that the absence of an allegation or finding that the report of the apparent suicide attempt was substantially false is fatal to plaintiff's due process claim).
 
 
 23
 The appellants argue that they were defamed by the defendants' statements to the media at the time that the NYCCOC was reorganizing its employment practices. For example, Robert E. Boyle, the president of the NYCCOC, stated that he aimed to "clean up the enormous featherbedding that we now have as well as the notorious presence of organized crime." Selwyn Raab, State to Hire a Work Force at Javits Hall, N.Y. TIMES, June 24, 1995, A6. Further, the appellants argue that the refusal to re-hire them, in the context of the statements made to the media, may qualify as a public declaration that they were corrupt and had ties to the mob. The district court found that the only public statement that was actually untrue was Boyle's public declaration that "[a]t any given time on our floor we have estimated that over 65% of the personnel on the floor were either convicted felons or associated with organized crime." Sacco v. Pataki, 114 F.Supp.2d 264, 271 (S.D.N.Y.2000) (quoting News at 11 (WPIX television broadcast, July 11, 1995)).
 
 
 24
 But this is simply not enough to support a claim of defamation. The gap in the appellants' allegations consists in a lack of a specific statement with respect to any one of them. As the appellees point out, an individual plaintiff must be clearly identifiable to support a claim for defamation. See New York Times Co. v. Sullivan, 376 U.S. 254, 288-89, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A defamation claim is insufficient if a statement merely makes reference to the plaintiff as a member of a group (the "group libel doctrine"). See Church of Scientology Int'l v. Time Warner, Inc., 806 F.Supp. 1157, 1160 (S.D.N.Y. 1992), aff'd 238 F.3d 168 (2d Cir.2001). The statement made by Boyle would probably not be deemed to apply to any individual since it refers to a group of more than one thousand people.
 
 
 25
 The appellants argue that members of a group can be subject to defamation when they "may be readily identified and the recipients of the [statements] are likely to identify some, if not all, of them as intended objects of the defamation." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir.1994) (citation omitted). But, under the group libel doctrine, "a plaintiff's claim is insufficient if the allegedly defamatory statement referenced the plaintiff solely as a member of a group." Church of Scientology, 806 F.Supp. at 1160. The appellants attempt to find support from Church of Scientology, in which the district court for the Southern District found that the group libel doctrine could be overcome where "`the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the member.'" 806 F.Supp. at 1160 (quoting Restatement (Second) of Torts § 564A(b)). But that case does not support the appellants' claim; it undermines it. In Church of Scientology, the court found that general references to "Scientology" in a news article were not sufficient to overcome the group libel doctrine, since the statements did not directly or impliedly refer to the plaintiff, Church of Scientology International. Id. at 1161. That is strikingly similar to the factual scenario here: while there were repeated references to corruption among Javits Center workers, none of the individual appellants was directly or impliedly identified. The appellants have therefore clearly failed to demonstrate the essential element of specific reference.
 
 
 26
 The appellants also fail to show that the stigma attributable to the statements was coupled with the loss of governmental employment or deprivation of a legal right or status, such as a loss of job opportunities. The appellants were not terminated from governmental jobs at the Javits Center; they are claiming that they should have received those jobs. Further, the only loss of employment opportunity that the appellants have demonstrated is the loss of the opportunity to work at the Javits Center—but this is not nearly as broad a deprivation as the constitutional doctrine requires. The appellants contend that their loss was a significant deprivation because the Javits Center is the dominant element in the trade show industry and it conducts about 90 percent of all trade show business in New York City. All but three of the appellants were prevented from working at the Javits Center. Sixteen of them have been unable to find any work; 37 of them have been unable to find any work in the trade show industry; 66 continue to work in the trade show industry, but with reduced hours; and five work in the industry but not as Local 829 members. Accepting as we must the truth of these allegations, see Adams v. Dep't, of Juvenile Justice, 143 F.3d 61, 65 (2d Cir. 1998), we cannot find that they rise to the level of an unconstitutional deprivation. First, the fact that the Javits Center conducts 90 percent of New York City's trade show business suggests that the reason for the plaintiffs' inability to find employment is the lack of available jobs — not the defendants' alleged defamation. Second, as the district court found, the plaintiffs failed to show that their skills were so specialized (and "their field" so narrow) that they necessarily needed employment in the trade show industry. See Baden v. Koch, 799 F.2d 825, 830-31 (2d Cir.1986) (explaining that plaintiff has not been foreclosed from a "range of opportunities" due to his demotion).
 
 III.
 
 27
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 Notes:
 
 
 *
 The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Sacco v. Pataki,, involved 62 members of Local 807. The Sacco plaintiffs are not prosecuting this appeal.
 
 
 [2]
 The appellants are not challenging the dismissal of claims against Governor Pataki or Chairman Mack